# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **MARK ARMSTRONG AND** | § | |
| **ERIKA ARMSTRONG,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **vs.** | § | **CIVIL ACTION NO. 4:18-cv-01238** |
| | § | |
| | § | |
| **WING ENTERPRISES, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANTS' RENEWED MOTION TO EXCLUDE
## THE TESTIMONY OF PETER POCZYNOK

Matthew S. Parish
TAUNTON SNYDER & PARISH, P.C.
State Bar No. 24014279
Federal Identification No. 25140
777 N Eldridge Pkwy, Suite 450
Houston, TX 77079
Telephone: (713) 961-5800
Facsimile: (713) 993-2308
mparish@tsplaw.com

***Attorney-in-Charge For Defendant,
Wing Enterprises, Inc.***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ II

INTRODUCTION ........................................................................................................... 1

MATERIAL FACTS AND EVIDENCE .......................................................................... 2

ISSUES FOR RESOLUTION .......................................................................................... 3

SUMMARY OF ARGUMENT ........................................................................................ 4

ARGUMENT & AUTHORITIES ..................................................................................... 4

    I.    Poczynok's Testing And Interpretation Yields Unreliable Results. ...................... 6

    II.   None Of Poczynok's Alternative Design Opinions Prove Relevant Or Reliable. ................................................................................................................. 15

    III.  Poczynok Fails To Connect Alleged Manufacturing Defects With The Accident. ................................................................................................................. 17

CONCLUSION AND PRAYER ...................................................................................... 20

# TABLE OF AUTHORITIES

## *Cases*

*Allen v. Pa. Eng'g Corp.,* 102 F.3d 194 (5th Cir.1996) ..................................................... 18

*Boca Raton Cmty. Hosp. Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227 (11th Cir. 2009) ............................................................................................................................................ 5

*Casey v. Toyota Motor Sales, U.S.A., Inc.*, No. 3:11-CV-3043-O, 2013 WL 12100194, at *2 (N.D. Tex. Sept. 27, 2013), *aff'd sub nom. Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322 (5th Cir. 2014) ..................................................... 15, 16, 17, 18

*Curtis v. M & S Petroleum, Inc.,* 174 F.3d 661 (5th Cir.1999) .................................... 5, 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .............................. 5

*Ford Motor Co. v. Ledesma,* 242 S.W.3d 32 (Tex.2007) ................................................ 17

*Garcia v. BRK Brands*, 266 F. Supp.2d 566 (S.D. Tex. 2014) ........................................ 16

*Hodges v. Mack Trucks, Inc.,* 474 F.3d 188 (5th Cir. 2006) ........................................... 17

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ....................................................... 4

*Moore v. Ashland Chem., Inc.,* 151 F.3d 269 (5th Cir.1998) (*en banc*) ............................ 5

*Pipitone v. Biomatrix, Inc.,* 288 F.3d 239 (5th Cir. 2002) .......................................... 6, 14

*Sierra v. Dorel Juvenile Grp.*, No. CV B: 12-232, 2014 WL 12598325 (S.D. Tex. Sept. 30, 2014) ..................................................................................................................... 16

*Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393 (5th Cir. 2016) ....................................... 16

*Smith v. Louisville Ladder Co.,* 237 F.3d 515 (5th Cir.2001) ......................................... 17

*United States v. Conn*, 297 F.3d 548 (7th Cir. 2002) ........................................................ 4

*Watkins v. Telsmith Inc.*, 121 F.3d 984 (5th Cir. 1997) .................................................. 16

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) ..................................... 4

*Wintz v. Northrop Corp.*, 110 F.3d 508 (7th Cir. 1997) .................................................... 4

## *Statutes*

Tex. Civ. Prac. & Rem. Code Ann. § 82.005(a) ............................................................... 15

### *Rules*

Fed. R. Evid. 401 ...................................................................................................... 4

Fed. R. Evid. 402 ...................................................................................................... 4

Fed. R. Evid. 702 ................................................................................................. 3, 4

# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **MARK ARMSTRONG AND** | § | |
| **ERIKA ARMSTRONG,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **vs.** | § | **CIVIL ACTION NO. 4:18-cv-01238** |
| | § | |
| | § | |
| **WING ENTERPRISES, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANTS' RENEWED MOTION TO EXCLUDE THE TESTIMONY OF PETER POCZYNOK

The causation theory espoused by Plaintiffs' expert, Peter Poczynok ("Poczynok"), clashes with the undisputed physical evidence from Armstrong's accident, including the 911 Call. Poczynok's opinions are based on testing that begins with a contrived condition and yields results that bear only a superficial resemblance to evidence from the scene. Even after the Court gave Poczynok the chance to reconsider evidence he dismissed as "inaccurate," Poczynok does nothing other than declare such previously rejected facts are "consistent" with his theory. Given the rules relating to admissibility of scientific or technical testimony, the Court should exclude his opinions.

## INTRODUCTION

This is a products liability case involving a Wing Enterprises Alta-One Model ladder (the "Ladder"). Plaintiff Mark Armstrong sustained a significant head injury when he fell from height. Plaintiffs contend that "the upper section of the Ladder telescoped . . .

due to a false lock condition" and "caused Armstrong to lose his balance and fall backward while holding onto the Ladder with his hands." Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (Dkt. 53), p. 7, on file with the Court. Plaintiffs retained experts Poczynok and Dr. Peter Francis to support this position. Poczynok provided testimony on the design and function of the Ladder. According to Poczynok, certain design and/or manufacturing defects in the Alta-One allow the ladder to be "false-locked." Poczynok defines such a condition as one that "presents the appearance, both visually and tactilely, that the extension is completely locked to the base when in reality complete locking has not been achieved." *See* Expert Report of Peter Poczynok dated February 28, 2019 ("Original Report"), p. 39, attached as Exhibit A.

Poczynok then conducted tests to show that an Alta-One being used in such a condition, *i.e.*, "when . . . complete locking has not been achieved," can: (1) telescope when a climber places a load on it; and (2) that such an action can cause a climber to lose his balance. Following his tests, Poczynok opined that due to certain design and/or manufacturing defects, the springs made part of the Alta-One's Lock Tabs would not deliver **sufficient** force to prevent the "false lock" condition.

The test results on which Poczynok relies proves contrary to undisputed evidence. As will be shown below, the analytical gaps and lack of quantitative data in Poczynok's work render his opinions unreliable, and therefore, inadmissible.

## MATERIAL FACTS AND EVIDENCE

Plaintiffs' theory rests on the notion that Armstrong lost his balance after his ladder telescoped during use. Poczynok opines that the telescoping resulted when Armstrong used

the ladder in a "false lock" condition, *i.e.*, without "completely locking" the Lock Tabs. There exists no legitimate evidence of either a false lock or telescoping. Poczynok's observations clash with the undisputed, contemporaneous evidence. These facts are discussed in more detail below.

During argument on Defendants' summary judgment motion, this Court recognized that Plaintiffs' theory could not square with the physical evidence. The Court understood that the 911 was a "game changer," furnishing indisputable evidence that Armstrong's body was on top of the ladder. *See* August 14, 2020 Hearing Transcript, 4:24-5:9, 11:7-11:13, attached as Exhibit B. The Court noted that Plaintiffs' experts were "pretty resolute that . . . no part of [Armstrong's] body was on top of the ladder," correctly observing that there was "nothing in [Plaintiffs'] expert reports that substantiate [Plaintiffs'] theory with him – with any part of [Armstrong] being on top of the ladder." *Id.* at 19:21-20:9, 18:21-18:25.

Rather than grant judgment immediately, the Court gave Plaintiffs an opportunity to "square" their opinions with the evidence from the accident scene. *Id.* at 21:8-21:24. Plaintiffs refused that opportunity. Poczynok conducted no new tests. He did no new research. He analyzed no new data. Poczynok did nothing other than declare the 911 Call was "consistent" with his previous testing, even though he had rejected exactly this possibility before.

## ISSUES FOR RESOLUTION

The Court must determine whether the opinions of Plaintiffs' expert Peter Poczynok are admissible under the reliability standards set forth by Fed. R. Evid. 702 and *Daubert*

when he has declined to square contrary evidence with his contrived theory, neglected to demonstrate how his proposed designs alternatives could yield a safer product, and failed to causally connect any alleged manufacturing defect with a failure in product performance.

## SUMMARY OF ARGUMENT

Poczynok's opinions cannot be considered reliable when his experiments yield results that prove contrary to the undisputable evidence from the accident. Additionally, Poczynok fails to support his opinion that proposed alternative designs could have substantially reduced the risk of Armstrong's injury. Nor does Poczynok explain how "variability" in spring force necessarily caused the Lock Tabs to perform improperly. Even given the recent opportunity to supplement, his opinions remain methodologically deficient, unreliable, and inadmissible.

## ARGUMENT & AUTHORITIES

A trial court should exclude the testimony of an expert if it cannot be found reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). An expert witness may be qualified and credible, but his conclusions may turn on unreliable methodology. For an expert's testimony to be reliable, these requirements must be met: (1) the testimony must contain sufficient facts or data, (2) the testimony must be the product of reliable principles and methods, and (3) the expert must reliably apply the principles and methods to the facts of the case. Fed. R. Evid. 702; *see United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002). Moreover, a trial court properly excludes expert opinion testimony if it is not relevant. *See* Fed. R. Evid. 401, 402, 702; *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999); *Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir. 1997); *see Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). Relevance requires that there be a valid scientific connection to the pertinent inquiry in the case. *Boca Raton Cmty. Hosp. Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009).

In *Daubert,* the Supreme Court explained that "Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant." *Curtis v. M & S Petroleum, Inc.,* 174 F.3d 661, 668 (5th Cir.1999) citing *Daubert,* 509 U.S. at 597. The reliability prong mandates that expert opinion "be grounded in the methods and procedures of science and ... be more than unsupported speculation or subjective belief." *Id.* (citing *Daubert,* 509 U.S. at 590); *see also Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir.1998) (*en banc*) ("[T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable."). The relevance prong requires the proponent to show that the expert's "reasoning or methodology can be properly applied to the facts in issue." *Curtis,* 174 F.3d at 668 citing *Daubert,* 509 U.S. at 592–93. District courts consider the following non-exclusive list of factors when conducting the reliability inquiry:

> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community. *Id.* at 668–69 *citing Daubert,* 509 U.S. at 593–94.

In this case, the Court should exclude Poczynok's opinions because they prove unreliable. The Court should also exclude his testimony because much of it is irrelevant. In many

critical instances, the evidence supporting Poczynok's opinions cannot allow a reasonable juror to conclude that the proposition is more likely to be true than false. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002).

## I.     Poczynok's Testing and Interpretation Yields Unreliable Results.

Poczynok's premise that a "false lock" condition led to a telescoping event lacks any legitimate scientific basis. Crucially, Poczynok's testing and opinions fail to explain: (1) how Armstrong landed on top of the Ladder; (2) how the Ladder was found with its upper extensions locked; (3) why the Ladder was found climbing side up (not down); (4) how Armstrong could have improperly set-up the ladder; (5) the location of the bloodstain; and (6) the damage to the Ladder itself. The Court cannot admit Plaintiffs' testing when none of the results to which they compare the accident proved consistent with the evidence above. Plaintiffs' testing could never replicate the above facts because such facts are fundamentally inconsistent with Plaintiffs' theory.

*First*, Poczynok's about-face on Armstrong's position relative to the Ladder after the accident completely robs him of credibility. The evidence from the scene was clear. EMT Devin Miracco remembered the incident because it was "strange," with Armstrong lying on "top of the ladder with his back on the ladder, facing up." Deposition of Devin Miracco ("Miracco"), 23:15-24:20, attached as Exhibit C. Miracco testified his drawing provided an accurate depiction of Armstrong's body in relation to the ladder. *Id.* at 89:6-89:17. It showed Armstrong's torso and legs entirely on top of the Ladder with his head just off to one side. Miracco, Exhibit 4 (testifying that Armstrong's head was "offset a little bit" with his body "diagonal just a little bit"). *Id.* at 30:15-31:9. He added that Armstrong's

head "was somewhat still on one of the ladder pieces." *Id.* at 33:7-33:16. The contemporaneous Montgomery County Hospital Records confirm Miracco's memory, reporting that "patient was lying supine on the ladder . . ." *Id.* at 39:2-39:7 and Exhibit 2. Miracco stated that "wherever that blood spot was is where his head was toward the top of the ladder." *Id.* at 88:5-88:20. Miracco's testimony showed Armstrong's body was on top of the Ladder and the blood stain underneath Armstrong's head. *Id.* at 89:6-90:5.

Before his opinions were challenged, Poczynok insisted that Armstrong fell with the Ladder landing on top of him. He dismissed Miracco's testimony as "completely at odds" with the recollections of Mrs. Kronshage. Deposition of Peter Poczynok ("Poczynok Deposition"), 97:15-98:9, attached as Exhibit D. Poczynok even declared the first responder, Miracco, as "incorrect in his recollection," *id.*, and insisted despite Miracco's testimony, that Armstrong fell with the Ladder on top of him. *See* Original Report, p.23 (describing the climber bringing the ladder with him); and Poczynok Deposition, 246:10-246:22 (Agreeing with the depictions of Francis).

Though Plaintiffs' experts refused to believe Miracco, the accuracy of his testimony was confirmed by the 911 Call. Just after seeing Armstrong hit the driveway, William Kronshage—who was located across the street—called 911. Kronshage described Armstrong as ***laying on top of the ladder***. Transcription of 911 Call, May 2, 2016, 3:12-3:19, attached as Exhibit E. (***emphasis added***). Kronshage said Armstrong had not moved. *Id.* at 5:7-5:8. Kronshage confirmed being in the driveway with Armstrong on the ground. *Id.* at 5:7-5:8. Mr. Kronshage told the dispatcher, ". . . the ladder must have slipped out.

And **he's laying partly on top of the ladder** . . ." *Id.* at 6:4-6:17. Just before the ambulance arrived, Kronshage confirmed Armstrong was still lying on the Ladder. *Id.* at 14:21-15:2.

Once the 911 Call proved that Miracco's recollection was correct and faced with this Court's correct belief that his expert report had been proven incorrect, Poczynok changed course. Now he claims that Miracco's testimony and the 911 Call are *consistent with* his theory, even though they are exactly opposite of what he said before. In fact, Poczynok treats the 911 Call as inconsequential:

> The transcript of Mr. Kronshage's call to 911 introduces no new information regarding Mr. Armstrong's position relative to the ladder after his fall. Mr. Miracco's deposition, which was considered in its entirely [sic] during the formulation of hypothesis, testing of those hypotheses, an analysis of the test results, places Mr. Armstrong on his back on top of the ladder. *See* Expert Report of Peter Poczynok—September 29, 2020 ("2020 Report"), p. 14, attached as Exhibit F.

The Court need only examine the images Poczynok now highlights to appreciate the fallacy of his misguided reversal. Recall, Poczynok contends that Armstrong fell and "brought the ladder with him, . . . just as Mrs. Kronshage described." 2020 Report, p. 10. The images below make clear that, in Poczynok's testing, the climber falls first and then pulls the ladder over.



2020 Report, pp. 12-13.

As the Court can readily discern, with the climber falling first and bringing the ladder with him as Poczynok surmises, it would be impossible for the ladder to reach the ground first such that Armstrong could have landed in the position described by Miracco and Mr. Kronshage, *i.e.*, on top of the Ladder. This is especially true when the Ladder is rotating down "about its feet" as Poczynok contends. *Id.* With the climber falling first, and he and the ladder falling at the same rate, Poczynok's testing will always have the climber, not the ladder, reach the ground first. This is how gravity works and ignoring it cannot be said to be consistent with reliable scientific methods.

Poczynok's results cannot be a surprise. Poczynok set out to replicate the observations of Mrs. Kronshage, who described Armstrong as falling backward, holding on to the ladder, and pulling the ladder on top of him. And Poczynok's testing reproduced this scenario. But Poczynok, in his deposition, acknowledged Mrs. Kronshage's description of Armstrong's position in relation to the Ladder was "completely at odds" with EMT Miracco's. And we now know that Miracco's recollection was correct. Thus, regardless of any newly discovered conviction on his part or how many times he can describe his results as "consistent" with the accident, Poczynok's test results will always contradict the undisputed evidence that Armstrong landed on top of the Ladder.

*Second*, by any objective measure, the post-accident configuration of Armstrong's ladder proves contrary to Poczynok's test results. Photographs of Armstrong's ladder show that the Lock Tabs on the upper extension of Plaintiff's ladder ***are fully engaged after*** the accident. *See* Poczynok Deposition, 110:16-111:15; *Also compare* Poczynok Deposition, Exhibits 7 and 8. None of Plaintiffs' testing showed the Lock Tabs on the upper extension engaged after a ladder fell to the ground. Poczynok's report depicts the Lock Tabs on the upper extension, *i.e.*, those Lock Tabs Poczynok set into a "false-lock" condition for his testing, remained unlocked after the climber fell. Original Report, p.25.

In his most recent report, Poczynok tries to explain this discrepancy by pointing to other tests runs, claiming this fact is "entirely consistent" with his "conclusions regarding the cause of the upper section collapse." 2020 Report, p. 19. In support of this dubious proposition, Poczynok suggests his testing showed comparable results. It did not. None of the other tests correspond with what Poczynok contends caused Armstrong's accident.

For example, the first five tests Poczynok conducted placed the Lock Tabs just above the swage ring. In these tests, it is true that when the ladder collapsed, the J-Locks inserted themselves. However, in these tests, the upper section telescoped less than an inch, the climber never lost balance, and the ladder never fell. Poczynok Deposition, 71:18-72:13. Poczynok does not believe Armstrong set up the ladder in this way. *Id.* at 74:8-75:11.

Poczynok performed ten tests with exemplar ladders in the "false lock" configuration they allege Armstrong managed in this case. Of those tests, only two had the J- Locks insert themselves after telescoping. In neither test did the climber bring the ladder with him or the ladder even fall to the ground. *See* Original Report, pp. 27-28 (Tests #9 and #15). In fact, only two tests (Tests #6 and #10) involved a telescoping event in which the climber **and** the ladder fell. *Id.* at pp. 23, 26. Both involved the climber's foot becoming trapped. *Id.* It is this entrapment, combined with the climber's fall, that pulls the ladder over in Poczynok's testing. And according to Plaintiffs' own expert, none of the tests after Test #6 could be deemed reliable in terms of the climber's reaction. *See* Report of Dr. Peter Francis—January 25, 2019, p. 7, attached as Exhibit G.

Poczynok cannot have it both ways and maintain any credible reliability. He cannot claim that Test #6 tracks "each element" of Armstrong's fall, and at the same time, contend that the Lock Tabs could have become re-engaged. If Armstrong's foot became entrapped by the telescoping upper section, the Lock Tabs could not have re-engaged. On the other hand, absent foot entrapment, Poczynok cannot point to a single test in which both the climber and ladder fell.

11

The configuration discrepancies are not limited to the upper extension. A photograph of Armstrong's ladder after the accident shows the Lock Tabs on the bottom extension disengaged. *See* ESi Investigative Report—Project No. 65382A submitted by Dr. Erick Knox ("ESi Report"), pp. 24-25, attached as Exhibit H. Poczynok testified these Lock Tabs never came out during his testing. Poczynok Deposition, 103:24-105:11; 105:22-106:2. Poczynok's *ipse dixit* statements that his testing yielded a ladder arrangement "consistent" the post fall configuration of Armstrong's ladder lacks objective support.

*Third*, photographs of Armstrong's ladder at the scene show the climbing side face up. Poczynok Deposition at 114:3-115:18. But Poczynok's testing requires the climbing side to have been face *down* after the accident. *Id.* In other words, when compared to its expected orientation under Plaintiffs' theory, Armstrong's ladder would have to have been flipped over at some point before being photographed. *Id.* There is no evidence showing the ladder was flipped over. To the contrary, Miracco indicated he was "pretty certain" the ladder was not flipped over. Miracco Deposition, 27:9-28:14. Miracco testified there would have been no reason to flip over the ladder. *Id.* Poczynok fails to provide any coherent explanation of how the Ladder could both beat Armstrong to the ground AND flipped over during the accident. His testing certainly does not support such a remarkable confluence of events.

*Fourth*, Poczynok's experiment does not satisfy Rule 703 because he set up the exemplar ladders for testing in a different way than Armstrong. Armstrong testified that he would have removed the ladder from his car, unfolded it, and extended the ladder to length

on the ground before putting it into place. Deposition of Mark Armstrong ("Armstrong Deposition"), 32:4-32:19, 34:16-35:16, attached as Exhibit I; Poczynok Deposition, 184:12-185:2. Poczynok started with an exemplar against a scaffold with the Lock Tabs of the upper extension engaged. Poczynok Deposition, 182:12-184:11. Poczynok then rotated the test ladder back from the scaffold, put the Lock Tabs into a "false lock" condition, and then positioned the ladder back onto the scaffold. *Id.*

Moreover, Armstrong was an OSHA-trained and experienced ladder user who was sure he would have looked at the Lock Tabs to make sure they were appropriately placed before climbing. Armstrong Deposition, 45:2-45:14, 39:4-39:12. Even Poczynok testified that anyone looking to determine whether the Lock Tabs were, in fact, locked could discern whether the locking mechanisms were properly engaged. Poczynok Deposition, 235:3-235:16. The notion that Armstrong accidentally "false locked" the Ladder when setting it up is completely implausible given the evidence.

*Fifth*, the location of the bloodstain is inconsistent with Poczynok's hypothesis. Poczynok took measurements to accurately locate the bloodstain and provided them in his report. Original Report, p. 16. And sure, Poczynok has described the location of this physical evidence as "consistent," but Poczynok has never made any quantitative attempt to connect the bloodstain location with his theory.

*Sixth*, the evidence differed from Poczynok's analysis on damage done to the ladder. Armstrong indicated that there was no damage to his ladder before May 2, 2016. *See* Armstrong Deposition, 88:10-88:12. Armstrong also denied there being any maintenance on or alterations to his ladder. *See* Plaintiffs' Responses to Defendant's First Set of

Interrogatories, pp. 4-5, attached as Exhibit J. When the ladder was made available for inspection in November 2018, it was found to be damaged. *See* ESi Report, pp. 33-36. The bottom extension section was bound, unable to be slid along the inner rail. *Id.* Two of the rungs on this same section were deformed. *Id.* Originally, Poczynok completely disregarded this damage, and he still fails to point to any of his tests that can explain it.

In sum, Poczynok's interpretation of his climbing test results cannot pass muster under *Daubert*. The reliability prong of *Daubert* requires an expert's opinion be grounded in methods and procedures of science and must be more than unsupported speculation or subjective belief. *See Curtis,* 174 F.3d at 668. Plaintiffs cannot demonstrate that Poczynok's tests objectively support their "false lock"-to-telescoping theory. Poczynok devised the climbing tests solely for this litigation. There is no established protocol or general acceptance of such testing. The techniques employed have not been subjected to peer review. And most problematic, the interpretation of the results is subjective, rendering only conclusions about the exemplar ladders that Poczynok describes as "similar to" or "consistent with" Armstrong's ladder. Original Report, p. 23. It is thus impossible for anyone to determine the rate of error.

The Court should exclude evidence of and results from Poczynok's climbing tests because the evidence allegedly supporting his opinions cannot allow a reasonable juror to conclude that either the "false lock" condition or telescoping event is more likely to have occurred than not. *See Pipitone*, 288 F.3d at 245.

## II. None Of Poczynok's Alternative Design Opinions Prove Relevant Or Reliable.

Where a plaintiff has proposed an alternative design, the lack of evidence to show the accident would have been avoided render opinions about such designs both unreliable and irrelevant. Poczynok opines that various components of the Lock Tab system suffer from design defects. He proposes alternative designs to the tip of the J-Lock bar, the holes of both the outer and inner sections, and the surface of the J-Lock shaft over which the spring travels. Poczynok, however, provides no evidence to indicate that such design changes would have prevented Armstrong's accident.

To establish a design defect, a claimant must prove a safer alternative design. *See Casey v. Toyota Motor Sales, U.S.A., Inc.*, No. 3:11-CV-3043-O, 2013 WL 12100194, at *2 (N.D. Tex. Sept. 27, 2013), *aff'd sub nom. Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322 (5th Cir. 2014). Texas law defines a "safer alternative design" as one that in reasonable probability:

> (1) would have prevented or significantly reduced the risk of the claimant's personal injury ... or death without substantially impairing the product's utility; and
>
> (2) was economically and technologically feasible at the time the product left the control of the manufacturer ... by the application of existing or reasonably achievable scientific knowledge.

Tex. Civ. Prac. & Rem. Code Ann. § 82.005(a).

Even if the Court were to accept the contrivance of a "false lock" condition leading to a telescoping event, Plaintiffs would still be required to show that the incorporation of

proposed design alternatives would have reduced the risk of injury. Poczynok made no such effort.

As the Fifth Circuit has noted, "Texas law expects that an alternative design be tested before a jury can reasonably conclude that the alternative would prevent or reduce the risk of injury." *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 407 (5th Cir. 2016); *Casey*, 770 F.3d at 332. An expert need not construct the proposed alternative, but some testing must be developed to establish the viability of an alternative design. *Id.* A proper methodology for proposing alternative designs involves more than just conceptualizing possibilities. *Watkins v. Telsmith Inc.*, 121 F.3d 984, 992 (5th Cir. 1997). In evaluating the reliability of testimony relating to design alternatives, whether the expert's opinion has been scientifically tested often proves the most important *Daubert* factor. *Garcia v. BRK Brands*, 266 F. Supp.2d 566, 574 (S.D. Tex. 2014); *Sierra v. Dorel Juvenile Grp.*, No. CV B: 12-232, 2014 WL 12598325, at *6 (S.D. Tex. Sept. 30, 2014). Without testing or other objective validation, the notion a particular design alternative could reduce the risk of an accident remains unreliable speculation.

Poczynok's reports do not show he performed any testing, modeling, or calculations to demonstrate his proposed design alternatives would have significantly reduced the risk of an alleged false locking condition and telescoping event. For example, regarding his alternative J-Lock tip design, Poczynok testified he did not perform any testing. Poczynok Deposition, 163:9-167:18. While he acknowledged that other ladder manufacturers used differently shaped tips, Poczynok did not draw any analogies to those other designs for safe performance. *Id.* at 161:20-162:9; 248:24-249:20. He acknowledged he did not generate

any quantitative data that would allow a jury to determine whether his proposed design changes would have reduced the likelihood of Armstrong' accident occurring in the manner imagined by the Plaintiffs. *Id.*

Poczynok's report also contains no information concerning the resulting utility of the Alta-One ladder if his proposed changes were made. Even if the proposed alternative would have reduced the risk of Armstrong's injury, Poczynok did not conduct a risk-utility analysis. To prove a safer alternative design, a plaintiff must show an alternative design's safety benefits are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety. *Casey*, 770 F.3d at 333; *Hodges v. Mack Trucks, Inc.,* 474 F.3d 188, 196 (5th Cir. 2006). The Fifth Circuit has held the lack of a risk-utility analysis in a ladder case alleging design defects to be fatal. *Id. citing Smith v. Louisville Ladder Co.,* 237 F.3d 515, 519 (5th Cir.2001). In none of his reports has Poczynok discussed the economic or technologically feasibility of incorporating his proposed changes in the Alta-One. With no feasibility analysis, Poczynok's opinions regarding alternative designs prove irrelevant.

### III. Poczynok Fails To Connect Alleged Manufacturing Defects With The Accident.

Without a connection between a manufacturing defect and the accident at issue, evidence of such defects proves irrelevant. Under Texas law, a plaintiff bears the burden of proving that the product was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries. *See Ford Motor Co. v. Ledesma,* 242 S.W.3d 32, 41-42 (Tex.2007). To prove a manufacturing defect, a specific

defect must be identified by competent evidence and other possible causes must be ruled out. *Id.* at 42. Texas law does not generally recognize a product failure or malfunction, standing alone, as sufficient proof of a product defect. *Id.* at 42; *Casey*, 770 F.3d at 326. Rather, the deviation from design that caused the injury must be identified. Otherwise, the jury is invited to find liability based on speculation as to the cause of the incident in issue. *Id.* The Fifth Circuit has been particularly careful to distinguish evidence that establishes a causal relationship between a product and an alleged injury, from evidence that merely suggests an association between the product at issue and the injury. *See Allen v. Pa. Eng'g Corp.,* 102 F.3d 194, 197 (5th Cir.1996).

Poczynok contends that surface roughness and smaller shaft diameter can diminish the amount of force a Lock Tab spring can deliver. Original Report, pp. 46-48. Plaintiffs' briefing parrots this contention, arguing that the Lock Tab springs must be capable of imparting "*sufficient*" force to both facilitate insertion of the pin into the extension and rung holes and to hold the pin in place. *See* Plaintiffs' MSJ Response, p. 9.

But Poczynok does *not* opine that the Lock Tab springs in Armstrong's ladder failed to deliver **sufficient** force to perform as intended. Poczynok did not calculate or analyze the **sufficiency** of the spring forces at work consistent with his proffered theory. Poczynok Deposition, 148:24-149:7; 229:12-230:9. In examining load-deflection curves of an exemplar Lock Tab mechanism, Poczynok insisted on talking about force "variability" not about the **sufficiency** of the force the spring proved capable of delivering. *Id.* at 221:8-223:21. This was so even though Poczynok acknowledges that when the holes of the inner and outer rail sections are properly aligned the amount of force the spring must exert to

18

affect engagement is less than when there is a mechanical blockage, Poczynok Deposition, 149:20-150:20, and that when the lock tabs are properly engaged, the amount of force necessary to hold them in place is minimal. *Id.* at 144:5-145:20.

More recently, Poczynok has tried to correlate the position of the J-Lock tip in his "false lock" scenario with a "drop" in available force from the spring. Plaintiffs apparently hope the Court will allow the inference that any supposed "drop" can lead to a lack of ***sufficient*** spring force. *See* Supplemental Expert Report of Peter Poczynok—September 10, 2019, attached as Exhibit K. But "variability" and "drops" are not surrogates for magnitude. Such evidence comes nowhere to establishing a causal relationship with Armstrong's injury.

Poczynok never tried to determine the magnitude of the force the Lock Tab springs would need to deliver for acceptable performance. Poczynok Deposition, 218:7-223:21. For example, Poczynok observed that results from Plaintiffs' load testing show a point at which the force from a Lock Tab spring in contraction "drops" from four pounds to three pounds. *Id.* at 228:14-230:9. According to Poczynok, this is the length at which the Lock Tabs would be interfacing with the inner rung holes. *Id.* But when asked specifically whether a spring force of only two and a half (2.5) pounds would be insufficient, Poczynok admitted he never analyzed this issue. *Id.* Poczynok references no deficiency in the magnitude of the force delivered by any of the springs in Armstrong's ladder. At no point does Poczynok provide any objective performance criteria the Lock-Tabs failed to meet. In sum, Poczynok never adequately connects his starting premise to Armstrong's accident,

namely that a "false lock" condition was caused by a Lock Tab spring failing to provide *sufficient* force because of some manufacturing defect.

## CONCLUSION AND PRAYER

Because Poczynok's opinions are not based on objective evidence, sound methodology, or complete analysis, the Court should exclude Poczynok's opinions.

Respectfully Submitted,

**TAUNTON SNYDER & PARISH**

*/s/ Matthew S. Parish*
Matthew S. Parish
State Bar No. 24014279
Federal Identification No. 25140
777 N Eldridge Pkwy, Suite 450
Houston, TX 77079
Telephone: (713) 961-5800
Facsimile: (713) 993-2308
mparish@tsplaw.com

***Attorney In Charge For Defendant,
Wing Enterprises, Inc.***

## CERTIFICATE OF COMPLIANCE

I certify that this Defendants' Renewed Motion to Exclude the Testimony of Peter Poczynok complies with the typeface and word-count requirements set forth in the Court's procedures. This filing has been prepared using Microsoft Word, in 13-point Times New Roman font for the text and any footnotes. It contains 4,968 words, as determined by the word count feature of the word processing program used to prepare this document, excluding those portions of the petition exempted by the Court's procedures.

*/s/ Matthew S. Parish*
Matthew S. Parish

## CERTIFICATE OF SERVICE

I certify that on November 20, 2020, a copy of the above instrument was electronically filed on the CM/ECF system, which will automatically serve as Notice of Electronic Filing to all parties. Parties may access the filing through the Court's Electronic Case Filing System.

*/s/ Matthew S. Parish*
Matthew S. Parish