**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

MARK ARMSTRONG AND
ERIKA ARMSTRONG,

        Plaintiffs

v.

    WING ENTERPRISES, INC.,

        Defendant.

**CIVIL ACTION NO. 4:18-cv-01238**

---

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR
SUMMARY JUDGMENT**

---

**LAW OFFICES OF FRIEDBERG
& BUNGE**

*/s/ THOMAS F. FRIEDBERG, ESQ.*
THOMAS F. FRIEDBERG, ESQ.
Federal ID 3193945
755 West A Street, Suite 100
P.O. Box 6814
San Diego, California 92101
619.557.0101 (Tel.)
619.557.0560 (Fax)
tom@lawofficefb.com

**THE AMARO LAW FIRM**

*/s/ R. JAMES AMARO, ESQ*
R. James Amaro
SBN: 24036134
Federal ID: 36070
Anna J. McMullen
SBN: 24109535
Federal ID: 3402763
2500 E. TC Jester Blvd., Ste. 525
Houston, Texas 77008
713.864.1941 (Tel.)
713.864.1942 (Fax)
fax@amarolawfirm.com

**ATTORNEYS FOR PLAINTIFFS MARK ARMSTRONG
and ERIKA ARMSTRONG**

# **TABLE OF CONTENTS**

I.   NATURE AND STAGE OF THE PROCEEDING ................................................................ 1

II.  STATEMENT OF MATERIAL FACTS ............................................................................. 3

      A.    Armstrong's Custom and Practice ........................................................... 3

      B.    Eyewitnesses to the Incident ................................................................... 4

      C.    Plaintiffs' Causation Experts' Opinions ................................................. 7

      D.    Defects in the Ladder ............................................................................. 9

      F.    Exemplar Ladder Testing ...................................................................... 17

III.  ARGUMENT .................................................................................................................... 23

      A.    Defendant's Request That the Court Ignore Plaintiffs' Experts' Testimony for Summary Judgment Is Improper ...................................... 23

      B.    Plaintiffs' Theory of Causation is Supported by Expert Testimony Based on Factual Evidence ..................................................................... 25

      C.    The Evidence that Defendant has Since Changed the Design of its J-Locks Supports the Defective Design Opinion of Plaintiffs' Expert ...... 27

      D.    Plaintiffs' Experts Have Tied the Manufacturing Defects in the J-lock with the False Locking that Caused Armstrong's Accident. ................... 28

IV.  CONCLUSION .................................................................................................................. 30

# INDEX OF AUTHORITIES

**Cases**

*Certain Underwriters at Lloyd's, London v. Axon Pressure Products Inc.*, 951 F.3d 248, 271 (5th Cir. 2020). ............................................................................................................... 24, 25

*Crochet v. Bristol-Myers Squibb Co.*, 804 Fed. Appx. 249, 256 (5th Cir. 2020) ........................ 25

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).................................. 25

*Dixon v. Int'l Harvester Co.* 754 F. 2d 573, 583-84 (5th Cir. 1985). ........................................... 28

*Edwards Sys. Tech., Inc. v. Digital Control Sys., Inc.*, 99 Fed. Appx. 911, 921 (Fed. Cir. 2004). ................................................................................................................................................. 26

*Luna v. Macy's S., Inc.*, CV H-17-1759, 2018 WL 3609053, at *6 (S.D. Tex. July 27, 2018).... 25

*Pennington v. Baylous*, CIV.A. H-03-4163, 2005 WL 2241014, at *2 (S.D. Tex. Sept. 15, 2005) ................................................................................................................................................. 25

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 241 (5th Cir. 2002). ............................................ 24, 25

*Watson v. Allstate Texas Lloyd's*, 224 Fed. Appx. 335, 342 (5th Cir. 2007); .............................. 26

**Rules**

FED. R. CIV. P. 56(a) ............................................................................................................. 2, 25

## I.      NATURE AND STAGE OF THE PROCEEDING

This is a product liability case in which Mark Armstrong ("Armstrong") suffered a severe traumatic brain injury when he fell from a defective Little Giant Alta One extension ladder (the "Ladder") designed, manufactured, and sold by Defendant Wing Enterprises, Inc. ("Wing").  The Ladder is made up of three components: one inner ladder assembly and two outer ladder assemblies that telescope over the inner section.  The inner and outer ladder assemblies work together with hinge locks and lock tabs to adjust the Ladder into different lengths and positions, including operating as an extension ladder.

Plaintiffs allege that the lock tab assemblies that secure the extension portion of the Ladder have both design and manufacturing defects and that as a result, the lock tabs or "J-locks" are prone to false lock.  In the false lock position, the J-locks appear to be in a fully locked position, but are not fully secured thereby permitting the extended section of the Ladder to collapse and telescope downward under load (i.e., when climbed by user in normal course of use).  The evidence obtained through discovery establishes that the locking assemblies on Wing's ladders incorporated component parts that did not meet the specifications required by the technical drawings and are not within required tolerances and that these defects caused or contributed to the failure of the Ladder that resulted in Plaintiffs' injuries. Plaintiffs' engineering experts have done extensive testing and analysis based on all of the available evidence to support their opinions that defects in Defendants' Ladder caused or contributed to Armstrong's accident.

Defendant's biomechanical and engineering expert, Erick Knox ("Knox"), disputes that the accident was caused by defects in the Ladder and that false locking occurred.  Knox

1

contends that Armstrong's fall was the result of a "slide-out" scenario.  Knox claims that Armstrong lost his balance when the ladder slid out from under him when he reached the top of the ladder and interacted with the roof.  Knox's theory relies on two facts that are contradicted in the evidence: (1) that Armstrong set up the ladder with the wheels facing down; and (2) that Armstrong had somehow lost his balance while at the top of the ladder and interacting with the roof.  Plaintiffs challenged Knox's theory as not being based on any reliable evidence, and being contradicted by eyewitness testimony and physical evidence.  Plaintiffs' motion to exclude Knox's testimony under *Daubert* was denied.

In its motion for summary judgment, Defendant argues that, as a matter of law, Plaintiffs cannot establish causation between the defects in their Ladder and Armstrong's accident.  The motion itself demonstrates that there are factual disputes that require resolution by a jury and preclude summary judgment under FED. R. CIV. P. 56(a).  Defendant asserts that its version of disputed facts is correct and that the Court should believe the causation theory of Defendant's expert and ignore facts that do not support their opinions such as the eyewitness testimony.  Because this is a complicated case that requires expert testimony based on conflicting factual evidence, summary judgment is not appropriate.  This Opposition to Defendant's renewed motion re-establishes the factual bases for Plaintiffs' causation theory to demonstrate why Defendants' motion must be denied.  This is a battle of experts where the experts on each side have given greater weight to facts which are consistent with their opinions.  Unlike Defendant's experts, Plaintiffs' experts have considered all of the evidence available, including but not limited to the eyewitness who saw Armstrong fall backwards while holding onto the ladder.

2

## II.      STATEMENT OF MATERIAL FACTS

### A.    Armstrong's Custom and Practice

This suit arises from an incident occurring on May 2, 2016 when Armstrong was using the Ladder to perform his work as a home inspector.  Due to the severity of his traumatic brain injury which resulted in Armstrong being in a coma for an extended period, Armstrong does not remember anything that happened on the day of the incident, so he does not specifically recall how he set up the Ladder on the day of this incident or how he fell. (Deposition of Mark S. Armstrong ("Armstrong Depo.") 38:15-39:2 [Exhibit 1][1].) Armstrong has worked in the residential construction business since 1995 and has regularly used ladders in the course of his career in construction.  (Armstrong Depo. 8:21-10:23.) Armstrong had used the Ladder approximately fifty times during home inspections prior to the accident.  (Armstrong Depo. 27:14-28:3.)  Armstrong testified about his custom and practice for setting up the Ladder to access the roof as part of his home inspection work. (Armstrong Depo. 31:7-32:13.)

When he first received the Ladder, Armstrong read the owner's manual that included instructions on how to safely use the ladder and all of the directions and safety warning labels on the ladder.   (Armstrong Depo. 19:3-10; 20:16-21:23; 22:4-23:6.) Armstrong knew the importance of setting up a ladder at a one-to-four, or 75-degree, ladder angle based on his experience, including a fall he had experienced in the past when a ladder

---

[1] All of the expert reports and evidence cited in this Opposition is attached as Exhibits to the Declaration of Thomas F, Friedberg in Support of Plaintiffs' Opposition to Defendant's Renewed Motion for Summary Judgment ("Friedberg Decl.").

was not set up at the proper angle.  (Armstrong Depo. 23:12-19.)  During his tenure as a union carpenter, Armstrong went through formal ladder training to learn how to achieve a 75-degree ladder angle and is OSHA 13 certified.  It is easy for Armstrong to visually determine if a ladder is set up at the proper angle and he can readily determine within a couple of degrees that a ladder is set up at a safe 75-degree angle.  (Armstrong Depo. 48:24-50:22.)  Armstrong testified that he always set up the Ladder with the wheels at the top. He testified he never set up the Ladder with the wheels at the bottom; and that he would have no reason to set it up in that manner.  (Armstrong Depo. 32:4-34:15.)  This evidence negates Knox's slide out theory.

Armstrong testified that to safely access a roof, three rungs of the ladder, or about three feet, must extend above the roofline.  (Armstrong Depo. 35:17-36:13.)  Armstrong testified that as part of his standard practice of securing the Ladder's lock tabs in place he listened to make sure the spring loaded lock tabs clicked into place and he also visually inspected them to make sure they were make sure they were appropriately placed. (Armstrong Depo. 38:1-39:12.)  Armstrong testified that to add additional height after leaning it against the roof, he would stand in front of the Ladder, grip it with his hands on both sides, unlock the tabs, push the extension up to the desired height, and let it go so the lock tabs spring into place.  (Armstrong Depo. 36:14-39:3.)

**B.    Eyewitnesses to the Incident**

There were two eyewitnesses to Armstrong's accident: neighbors William and Susan Kronshage, who were returning to their home across the street at the time of the subject incident.  (Deposition of William Kronshage ("William Kronshage Depo.") 9:2-

10; 10:2-4 [Exhibit 2].)  Mr. Kronshage testified that as he drove past the subject house, he saw a man in front of a ladder that was leaning against the house at an angle with some portion of the ladder above the rain gutter.  (William Kronshage Depo. 14:5-18; 17:1-18:4.) Mr. Kronshage testified that after he parked their car, his wife shouted that the man [Armstrong] was falling.  Mr. Kronshage testified he looked and saw Armstrong fall backward onto the driveway.  (William Kronshage Depo. 19:18-20:6.)  Mr. Kronshage saw the back of Armstrong's head hit the ground and bounce, with Armstrong facing straight up and the crown of his head facing the street.  (William Kronshage Depo. 21:8-11; 21:22-9; 22:13-17.)  Mr. Kronshage walked over to check on Armstrong, who was flat on his back, perpendicular to the house, with his feet toward the building and his head toward the street. (William Kronshage Depo. 22:21-23:9; 30:10-31:21.)  During his deposition on January 8, 2019—nearly 3 years after he witnessed Armstrong fall—Mr. Kronshage testified that "[he did not] remember where the ladder was.  [To] be very honest [].  [He did] not know."  (William Kronshage Depo. 40:6-7.)  Only when pressed for a more definitive answer did Mr. Kronshage state that he did not believe that Armstrong was resting on top of the Ladder.  (William Kronshage Depo. 40:8-15.)

Susan Kronshage testified that she witnessed Armstrong's actual fall.  Mrs. Kronshage testified that she saw Armstrong in a climbing position on the Ladder, then falling backwards and taking the Ladder with him.  Mrs. Kronshage testified that Armstrong's feet were on the Ladder and his hands were gripping the Ladder as he fell, with the Ladder landing on top of him.  (Deposition of Susan Kronshage ("Susan Kronshage Depo.") 7:9-8:24 [Exhibit 3].)  Mrs. Kronshage testified that Armstrong came

5

into her field of vision before he hit the ground and it appeared that he was holding onto the Ladder with both hands and "it came with him."  (Susan Kronshage Depo. 14:1-17.) Mrs. Kronshage indicated that Armstrong was near the top of the ladder.  She testified, "What I saw was he was somewhere up—up here (indicating toward the top of the ladder). I couldn't see the top of the ladder.  I don't know if it was above the roof or below."  (Mrs. Kronshage Depo. 41:8-15.)  Mrs. Kronshage testified, "But what I saw was his whole body, head to toe, was on the ladder.  And he was hanging onto it and he brought it down with him."  (Mrs. Kronshage Depo. 41:17-20.)

Mrs. Kronshage testified that the Ladder, with Armstrong gripping it, fell backwards.  In the videotaped deposition, she demonstrated the Ladder falling straight back in the manner she described.  (Mrs. Kronshage Depo. 41:21-23.)  Mrs. Kronshage testified she did not see the ladder slide out or move side to side.  She testified, "I just saw the weight of his body take it right straight down to the ground."  (Mrs. Kronshage Depo. 26:14-19.)  Mrs. Kronshage testified that Armstrong's body was within the rails of the Ladder; and the weight of his body pulled the Ladder with him as he fell backwards, with the Ladder landing on top of Armstrong's body.  (Mrs. Kronshage Depo. 26:22-27:20.) There is no testimony on whether Armstrong ever let go of the ladder before his head made impact with the cement or if he moved himself or the ladder after his head hit the cement and before Mr. Kronshage made his way to Armstrong after taking the time to move his wheel chair bound wife inside their home.

After Mr. and Mrs. Kronshage were deposed, the 911 call that Mr. Kronshage made on the day of the incident was introduced into discovery.  This 911 call provides more

evidence relating to the location of the Ladder related to Armstrong's body—which Mr. Kronshage admitted not remembering at the time of his deposition.  Mr. Kronshage tells the 911 operator that "[Armstrong was] laying partly on top of the ladder, which [was] on the ground."  (911 Call Transcript, p. 6, lines 15-16.)  Kronshage's description of Armstrong's location relative to the ladder is consistent with the testimony of Devin Miracco, the first responding paramedic, who testified that "[Armstrong] was on top of the ladder with his back on the ladder, facing up."  (*See* Deposition of Devin Miracco ("Miracco Depo." 22:14-20.)

C.    **Plaintiffs' Causation Experts' Opinions**

Plaintiffs' engineering expert, Peter Poczynok, P.E. ("Poczynok") is Plaintiffs' causation expert who has testified as to the defects that caused the false lock and telescopic event resulting in the fall.  Peter Francis, Ph.D. ("Dr. Francis") is Plaintiffs' biomechanical expert, who testified as to the relation of the mechanical event (i.e., the false lock and fall) to the injuries which resulted in the back of Armstrong's head striking the concrete.  Both have concluded based on the evidence and testing of exemplars, that the causative event that resulted in Armstrong's fall from the Ladder was the downward telescoping of the upper extension of the Ladder when Armstrong placed his foot and body weight on the rung of the upper extension as he was ascending the Ladder while in a false lock condition. Both Poczynok and Dr. Francis conclude based on witness testimony, evidence, and testing, that Armstrong mounted the Ladder and began to climb the Ladder using a three point climbing method with his body between the rails as he climbed.  When Armstrong's foot reached rung nine, the upper section of the Ladder telescoped one rung due to a false

lock condition of the J-locks on the upper section of the Ladder.  The telescoping caused Armstrong to lose his balance and fall backward while holding onto the Ladder with his hands.  (Expert Report of Peter Poczynok dated February 28, 2019 ("Poczynok Report") at p. 23; Deposition of Peter Poczynok ("Poczynok Depo.") 124:1-14; 82:5-84:14; 239:12-242:8; Expert Report of Peter Francis, Ph.D., dated January 25, 2019 ("Francis Report") at pp. 12-15, 18.)

Both Poczynok and Dr. Francis also ruled out other potential causes of the fall, including the slide out theory proffered by Defendant's expert, Knox.  As stated in their Reports, Mrs. Kronshage's testimony supports Armstrong falling backwards gripping the Ladder and she did not see the Ladder slide out or fall sideways, as speculated by Knox in his opinion.  In addition, the location of Knox's body and the Ladder are not consistent with a sideways fall, which would have resulted in both Armstrong's body and the Ladder being oriented parallel to the front of the house.  The evidence and eyewitness testimony rule out misuse of the Ladder by Armstrong.  (Poczynok September 22, 2020 Supplemental Report at pp 14-15; Francis January 25, 2019 Report at p. 13.)

Plaintiffs' experts originally produced reports and were deposed prior to the discovery of the 911 call, and their opinions regarding Armstrong's relative location to the Ladder differed based on the evidence available to the experts at the time.  Since the 911 call's discovery, Plaintiffs' experts have supplemented their reports to account for the additional evidence confirming Miracco's testimony that Armstrong's body was face up and partially on top of the ladder.  That fact is not a "game changer" on the causation opinions as Defendant has suggested.  The evidence still supports the causation theory of

8

Plaintiffs' experts that Armstrong fell backwards while climbing on the Ladder due to the release of the false locked J-locks, as confirmed during laboratory testing.  (Poczynok September 29, 2020 Report; Francis September 28, 2020 Report.)

**D.    Defects in the Ladder**

### 1)  Manufacturing Defects

Plaintiffs' experts have concluded that the telescoping of the upper extension of the Ladder that caused Armstrong's fall was caused by a "false lock" condition.  False locking is a condition whereby the locking system of an extension ladder is partially, but not fully, engaged.  It presents the appearance, both visually and tactilely, that the extension is completely locked to the base when in reality, complete locking has not been achieved.

Locking of each extension is achieved through the use of spring-loaded locking pins in the form of a J ("J-lock") that are inserted through openings in the rails of the extensions and then into holes in the rails of the ladder structure beneath.  When the pin is fully inserted through the extension rail hole and fully into the base rail hole, the lock is engaged.  A spring attached to the J-lock pin urges the end of the J-lock inward toward the center of the ladder and through the holes.  Insertion of the pin end of the J-lock through the extension hole and into the base hole requires alignment of those holes with one another as well as with the pin.  If the pin is not aligned with the outer hole, its tip will rest on the side of the extension rail.  If the J-lock pin is aligned with the extension rail hole, but that hole is not aligned with the base rail hole, then the tip of the J-lock pin will pass through the extension rail but rest against the side of the base rail.  This is a false lock condition.  (Poczynok February 28, 2019 Report at pp. 38-39.)  A false lock condition is a defect.

Successful insertion of the J-lock pin through the extension rail and fully into the hole in the base rail is dependent on a number of factors.  The force imparted by the spring onto the J-lock pin must be sufficient to overcome the resistances created by friction between the surface of the pin and the inner surfaces of the extensions rail hole and the base rail hole.  It must also be sufficient to overcome misalignments of the holes, and to hold the pin in place during use and movement of the ladder.  (Poczynok February 28, 2019 Report at p. 39.)  If the force is not enough, it can contribute to an increased chance of a false lock.

The tip of the J-lock pin must exhibit a geometry that facilitates insertion of the pin into the holes.  To do so, it must minimize the probability of the tip of the pin being restrained due to contact with the inside surface of the extension rail hole, the inner surface of the base rail hole, the edges of either hole, or the circular ring created around the base rail hole by the swaging operation.  When confronted with compressive forces created by the weight of the extension acting downward on the pin while it is in contact with the lower edge of the base hole, the geometry of the pin tip in conjunction with the applied spring force must still be capable of achieving complete insertion.  (Poczynok February 28, 2019 Report at p. 39.)  In sum, the shape of the tip of the pin also matters to decrease the chances of a false lock, especially in conjunction with the force of the spring and any potential friction in the design.

In tests performed on exemplar Alta-One ladders by Plaintiffs' engineering expert, two modes of false locking were identified as occurring.  The first involves insertion of the J-lock pin through the extension hole but coming into contact with the base rail just above

10

and in contact with the swage ring around the base hole.  In that condition, the tip of the pin is forced by the spring against the side of the base rail, and the pin rests on the ledge created by the swage ring.  (Poczynok February 28, 2019 Report at p. 39.)

The second identified mode of false locking on the Alta One ladders also involves penetration of tip of the J-lock pin through the hole in the extension.  However, in that case, the tip comes to rest against the edge of the swage ring at the bottom of the hole but on the top ledge of the ring.  The force of the spring holds the tip of the J-lock pin against the upper edge of the swage ring, while the upper surface of the inside of the extension hole exerts a compressive force on the top of the pin.  In both cases, the J-locks are partially, but not completely inserted.  The testing by Plaintiffs' expert demonstrated that the false locks permit the placement and movement of the ladder with the extension remaining elevated.  Obviously, the Ladder should not be able to false lock this way and was not designed to false lock due to the inherent dangers.  Only when a sufficiently large downward force is imparted to the upper extension is the false lock overcome and the extension descends.  (Poczynok February 28, 2019 Report at p. 39.)  That is, only when a climber puts his body weight on an upper rung will he learn there is a false lock condition when it slides down on him.

A critical factor influencing engagement of the J-locks is the force of the spring urging the J-lock pin into the intended openings in the extension rail and the base rail.  Physical contact between the J-lock pin and other components of the ladder create forces that act in opposition to the spring force.  Likewise, contact between the spring itself and its surrounding environment also reduces the force applied by the spring to engage the J-

11

lock.  On an assembled J-lock, the spring is located around the smaller diameter section of the J-lock pin.  This length of the J-lock pin is not polished, resulting in it having a rough surface created by the machining operation that reduced the diameter of this section of the pin.  As the spring is compressed, it buckles, and it contacts the rough surface of the pin. Friction between the spring coils and the surface of the J-lock pin creates resistance to the spring extending, thus limiting the force available to drive the J-lock pin into full engagement.  (Poczynok February 28, 2019 Report at pp. 46-47.)  Because the pin was not polished and rough on its surface, there was more friction which increased the chances of false-lock.

If there is roughness of the J-lock pin surface, as here, this will likely lead to variability in the spring force engaging the J-lock.  Destructive testing on exemplar ladders by Plaintiffs' experts confirmed surface roughness of the J-lock pin surface.  The experts' measurement of the spring forces of each J-lock on the artifact ladder demonstrated variability in the spring forces.  This variability is most likely due to the inconsistent spring forces due to the surface roughness of the J-lock pin surface.  The rough surface of the J-lock pin in the area of the spring is a manufacturing defect, as it is created by the turning operation performed on the J-lock pin to reduce its diameter in this area.  (Poczynok February 28, 2019 Report at p. 47.)

Wing's manufacturing Drawing No. 50952 contains the specifications for the J-lock pin.  Specifically, the drawing requires that the radial surface of the 0.375 inch diameter shaft over which the spring fits "must be smooth and free of cracks."  (Wing Drawing No.

12

50952, "Shaft, Lock Assy Type 1 [Exhibit 11]; Poczynok February 28, 2019 Report at p.

47.)  The very fact that the J-lock pin has surface roughness is itself a manufacturing defect.

Wing's Drawing No. 50952 also specifies that the diameter of the J-lock pin where

the spring is located must be 0.375 inches, plus or minus .010."  A second manufacturing

defect was identified by Plaintiffs' spring expert, Mark Hayes ("Hayes").  Specifically,

Hayes found that the diameter of the shaft of the J-lock pin on which the spring rides was

out of tolerance on all four of the Wing J-lock exemplars he examined.  Hayes found that

the shafts on all four J-lock pins had dimensions of less than 0.356."  Hayes concludes that

the out of tolerance J-lock pin shafts will affect the variability of the spring load output.

The effect of the out of tolerance diameter is that the spring will "snake" more before

making contact with the J-lock pin, thereby making the load output of the springs more

variable.  (Expert Report of Mark Hayes, dba Spring Expert ("Hayes Report"), at pp. 4, 11;

Poczynok February 28, 2019 Report at pp. 47-49.)

Plaintiffs' engineering expert concludes that either of the manufacturing defects—

the failure to provide a surface "smooth and free of cracks" and the out of tolerance

diameter of the J-lock pin shaft below 0.375"—contribute to a reduction in the spring force

applied to the J-lock.  The insertion force of the spring is lessened by frictional resistance

caused by contact of the spring with the rough surface, and also by deformation of the

spring permitted by the smaller diameter of the guide shaft.  The undersized diameter of

the J-lock pin in the area of the spring allows the spring to deflect to a greater degree than

it would on a larger shaft required by the manufacturing specifications in Drawing No.

50952.  Diminished spring force contributes to false locking of the J-lock, as there is less

13

force pushing the lock through the hole in the extension rail and into full engagement. (Poczynok February 28, 2019 Report at pp. 47-49; Poczynok Depo. 224:13-227:13; Hayes Report at pp. 4, 11.)   The Ladder was not manufactured as designed and this defect contributed to causing the false lock condition which led to Armstrong's fall.

### 2) Design Defects

Plaintiffs' experts have also identified design defects in Defendant's J-locks on the Ladder that cause or contribute to the false lock that caused Plaintiffs' injuries.  The first defect is the shape of the end of the J-lock pin that is intended to pass through a hole in the extension rail and into a hole in the base rail, securing the extension to the base.  The tip of the pin is only slightly rounded, with a 0.375 radius on the end of a 0.563 inch (design dimension) round shaft.  An edge is created where the radius meets the non-tapered shaft. This edge, when forced into contact with the base hole swage ring, creates the false lock. The almost flat tip of the J-lock pin does little to guide the pin into the intended location because it is so shallow.  The tip of the J-lock pin shaft could have and should have been manufactured with a profile akin to that of a round-nose bullet to provide less flat surface area which contributes to false lock conditions.  The leading surface area of the tip would be significantly reduced and the sides of the pin tapered to facilitate its insertion through the extension rail hole and into the base rail hole.  No edge would be present as is found on the J-lock pins of the artifact and exemplar Alta-One ladders.  (Poczynok February 28, 2019 Report at pp. 42, 48; Poczynok Depo. 159:20-161:9; 162:20-163:8; 164:21-165:2.)

The Ladder's design also has a defect which creates unintended friction, thereby increasing the chance of a false lock condition.  Contact between the surface of the J-lock

14

pin and the inside surface of the extension hole create a frictional force that acts opposite to the spring force attempting to insert the J-lock. The magnitude of this opposing force is dependent on the coefficient of friction between the two surfaces in contact. The steel J-lock pin is polished in this area, but the inner surface of the hole is not. Polishing the inner surface of the hole would lower the coefficient of friction and thus the frictional resistance to the spring force. Another modification to the extension rail hole to aid in the insertion of the J-lock pin and reduce the probability of a false lock occurring is to bevel or ramp the inner surface of the extension hole. This would prevent the tip of the J-lock pin from encountering a sharp edge that would interfere with its insertion. (Poczynok February 28, 2019 Report at pp. 43, 48; Poczynok Depo. 235:18-238:1.)

During examination of the Ladder that Armstrong was using when he fell, deformed areas at the top and bottom of each extension rail hole were noted. This deformation was caused by the two tabs stamped into the steel J-lock pin to limit its travel into the hole striking the aluminum rail of the extension. The deformation of the extension rail hole could have been avoided by using an alternative design that employs a shoulder or washer at the location of the tabs. The larger surface of the washer or shoulder face would distribute the load being imparted to the extension rail over a far greater area. This would prevent the damage seen on the artifact ladder caused by the steel tabs. (Poczynok February 28, 2019 Report at pp. 44, 48.)

Further, there is a design defect regarding the swage ring which increases the likelihood of a false lock. When the Alta-One ladders being tested false locked, the tip of the J-lock pin rested on the inner lip of the swage ring present around the base rail hole. It

15

was held in place by the J-lock spring, which applied a force pushing the tip into the ring, as well as by the weight of the extension being applied to the top of the J-lock pin through contact of the inside of the extension hole with the top of the pin.  Plaintiffs' expert opined that this defective condition can be ameliorated by eliminating the swage ring.  Alternative methods of attachment such as welding could have and should have been utilized, followed by a grinding operation to smooth the surface and bevel the edge, facilitating J-lock pin insertion, and eliminating the very location and geometry where the false lock occurs. (Poczynok Report at pp. 44, 48.)

In the artifact Ladder, retention of the spring on the J-lock pin is accomplished through the use of a washer placed on the spring that sandwiches the spring between the plastic retainer and the washer.  The end of the J-lock pin is then pressed, creating a geometry that captures the washer, and thus, the spring.  This method of retention results in spring force variability, as the washer can and does rock back and forth on the crushed end of the J-lock pin.  The surface of the washer in contact with the spring is not always oriented perpendicular to the long axis of the spring.  The spring could and should have been retained on the J-lock pin by flattening the end of the pin so that the washer would remain flat relative to the spring end.  (Poczynok February 28, 2019 Report at pp. 44, 48; Poczynok Depo. 238:3-239:11.)

Wing discontinued the Alta One in or about 2018.  The newer model is called the "Megalite."  Defendant has disclosed technical drawings depicting the J-lock assembly for the Megalite ladder.  Those technical drawings and the photographs of the new Megalite

J-lock assembly are included in the Exhibits filed with Plaintiffs' Opposition. (Friedberg Decl., ¶14 , Exhibit 14.)

As shown in the drawings and photographs of Defendant's newer ladder, Defendant has changed the tip of the J-lock on the Megalite to a more tapered shape, similar to what was recommended by Plaintiffs' expert. More significantly, the radial surface for the spring shaft is now smooth and free of cracks, thereby minimizing the likelihood of the spring meeting unexpected resistance through unintended friction which contributed to the false locking condition that was document by Poczynok. (Friedberg Decl. at ¶ 14; Exhibit 11.) Thus, the feasibility of alternative designs which would reduce or eliminate the false lock conditions has been established through evidence that Defendant adopted these very changes. Despite this evidence, Defendant still contends in their Motion that Plaintiffs have not established the feasibility of the alternative design that is now being used by Defendant for their J-locks in the Megalite line of ladders.

## F.   Exemplar Ladder Testing

Wing employees have testified that false locking of the Ladder cannot occur. Wing claims it has never been able to raise a false-locked ladder into an upright position without the ladder collapsing before the user climbs onto it. Defendant's expert, Knox, disputes that there is such a thing as false locking. He claims the J-locks on Wing's Alta-One Ladder are either locked or unlocked, with no condition falling between those extremes.

To test the defense claims, Poczynok conducted scientific testing that showed that false locking of the Ladder can in fact occur. Poczynok conducted two sets of tests: dynamic and static testing. The dynamic testing was to determine the following: (1) with

17

the lower extension of the Ladder fully locked and the upper extension section false locked, whether the upper extension section would remain in an extended position when leaned against an object at a 75-degree angle or collapse under its own weight; and (2) whether the upper extension of the Ladder, if placed in a false locked position, would collapse when a climber reached the upper extension, with the climber and Ladder falling backwards with the ladder landing on top of the climber in a manner consistent with the eye witness testimony.  (Poczynok February 28, 2019 Report at pp. 16-37.)

Poczynok's dynamic ladder testing confirmed the following: (1) that the Ladder when set up in a manner consistent with Armstrong's custom and practice, and if placed in a false locked position, will permit the climber to climb the lower section of the ladder without the upper section collapsing; (2) that the upper section in a false locked position will collapse when the climber places weight on a upper ladder rung; and (3) the manner in which the upper extension collapses with the climber and ladder falling backwards is consistent with the 911 call and the testimony of the responding Paramedic.  (Poczynok Report September 29, 2020 at pp. 10, 14 &26; Francis September 28, 2020 Report at pp. 17-18.)   The Ladder could have fallen on top of Armstrong as supported by Mrs. Kronshage's testimony or Armstrong could have been partially on top of the Ladder as supported by the 911 call and the testimony of the Paramedic.  Neither ultimate positions vis-à-vis each other negate Plaintiffs' expert causation opinions based on the most important and consistent fact that he fell backwards and struck his head which can only happen if the ladder falls backward and Armstrong falls backward (not a slide out).

18

As to the cause of Armstrong and the Ladder both falling backwards like the Kronshages both testified to under oath, Poczynok's static testing was to determine the propensity of the J-locks to false lock and the impact of the manufacturing and design defects on the spring force and the ability of the J-lock to properly engage.  (Poczynok June 28, 2019 Report at pp. 6-7.)  Poczynok placed the exemplar ladder in a 75-degree angle with both J-locks fully locked, and then one of the J-locks was disengaged and let go. Poczynok was testing the following: (1) whether the spring force of the disengaged J-lock was sufficient for it to properly reengage the J-lock pin in a locked position; and (2) whether the manufacturing and design defects reduced the spring force in a way that prevents proper engagement of the J-lock and results in a false lock condition.  (Poczynok June 28, 2019 Report at pp. 6-7.)

Poczynok performed this testing to determine the accuracy of Wing's testimony and documentation contending that the J-lock will always reengage.  The static testing was performed 13 times.  In 12 of the 13 tests, the disengaged J-lock did not properly reengage, i.e., the J-lock pin did not fully insert itself into the guide rail hole.  Poczynok's static testing confirmed quantitatively that the false locking was caused by the variability in the spring force.  Poczynok's testing resulted in a 92% rate of achieving *false locking* by simply pulling out and then releasing the J-lock. (Poczynok June 28, 2019 Report at p. 7.)  The testing is based on valid data and is consistent with Armstrong's practice of extending the height of the ladder by pulling it away from the roof, pulling the J-locks out of the holes, and then releasing them to engage the pin in holes higher up on the ladder.  (Armstrong Depo. 36:14-39:3.)

Poczynok's dynamic and static testing shows that the false-locked ladder can be raised into position and the upper extension will remain elevated until the user climbs onto the ladder, causing it to telescope and the user to fall in a manner consistent with the description in eyewitness testimony of the Kronshages.  Poczynok and Francis will testify the scenario they were able to repeat with actual testing is consistent with the available evidence and the most likely cause of Armstrong's fall.  (Francis January 25, 2019 Report at pp. 14-15; Poczynok February 28, 2019 Report at pp. 48-49; Poczynok June 28, 2019 Report at pp. 7-9.)

Plaintiffs' spring expert, Hayes, performed load deflection testing on an exemplar Alta-One J-lock that established a decrease in spring strength which is attributable to the out-of-tolerance manufacturing defects.  (Hayes Report at pp. 4, 11.)  Hayes' tests show a significant dip in the line characterizing the load decreasing direction.  The dip indicates a decrease in the spring force when the spring is at that extension which is attributable to deflection of the spring as the J-lock is attempting to be inserted into the side of the ladder and locked.  The sudden decrease in spring force occurs in the range of 0.48 to 0.55 inches of extension.  This means that as the J-lock spring attempts to insert the bar of the J-lock through the hole in the extension rail and into the rung tube bounded by the swage ring, it suddenly reduces the amount of force it is applying by approximately 25% of the available force.  (Hayes Report at pp. 4-6; Poczynok June 28, 2019 Report at pp. 2-6.)

To determine if this sudden and significant loss of spring force contributes to the creation of a false lock, Poczynok performed static testing with an exemplar ladder. Poczynok set up the Ladder as an extension ladder against a wall at a 75-degree angle and

20

placed the J-locks into a false locked position.  The upper extension did not telescope down.

Poczynok then placed the J-locks on both sides into a fully locked position.  Poczynok

pulled the J-lock on one side to a fully disengaged position leaving the J-lock on the other

side in a fully locked position.  Poczynok then pulled one of the J-locks out from the fully

locked position and let go of the J-lock.  Theoretically, the spring force should have caused

the J-locks to fully reengage.  However, in 12 of 13 attempts, the J-lock false locked.

(Poczynok June 28, 2019 Report at p.7.)

Poczynok then measured the distance the J-locks are extended when they are false

locked.  (Poczynok June 28, 2019 Report at pp. 3-4.)  When the measurements are

compared to the dip seen in Hayes' graphs, the data confirms that false locking of the Alta-

One J-locks occurs during the period of reduced spring force due to the buckling of the

spring.  The approximately 25% reduction in spring force occurs at the point when the nose

of the J-lock is in contact with the inner surface of the swage ring.  There is therefore less

spring force urging the J-lock into a locked position when false locking occurs.  (Poczynok

Report June 28, 2019 at pp. 3-4.)  As Poczynok and Hayes both discuss at length in their

reports, the reduction in spring force is attributable to buckling of the spring, due to an

undersized guide rod that has been manufactured out of tolerance.  Poczynok and Hayes

have established with reliable testing and valid data that the manufacturing defects in

Defendant's Alta-One J-locks cause a reduction in spring force at the point when the spring

is attempting to insert the lock pin into the rail hole, which results in false locking.  (Hayes

Report at p. 11; Poczynok February 28, 2019 Report at pp. 46-49; Poczynok June 28, 2019

Report at pp. 2-4.)

21

In its motion for summary judgment, Defendant criticizes Poczynok's spring evidence by suggesting that no testing was done to establish whether the documented 3 to 4 pounds of spring force was insufficient to provide sufficient force to urge to J-lock into the hole. They fail to see the point. What Defendant fails to understand is that it is not the amount of constant spring force which causes the false lock. It is the sudden unexpected *reduction* of 25% of the available spring force during the expansion and compression of the spring which causes the false lock in the subject conditions. Whether the spring has a constant 3 pounds of force or a constant 4 pounds of force is irrelevant. Plaintiffs' experts have demonstrated that it is the *sudden loss of force* which creates the false locking condition. It is not a "sufficiency" of force defect as they argue.

As explained by Plaintiffs' experts, the surface roughness of the J-lock shaft and the undersized J-lock shaft causes the spring to kink in its travel along the shaft. The kinking of the spring results in an unexpected drop of 25% of the available spring force from either 4 pounds to 3 pounds of force or from 3 pounds to 3.25 pounds of force. The unexpected loss of 25% of force occurs about one-half inch into the extension of the J-lock. As Poczynok's testing shows, the sudden reduction of force occurs at the point the spring is attempting to insert the tip of the J-lock through the hole in the extension rail and into the rung tube bounded by the swage ring. The tip of the J-lock pin is in contact with the inner surface of the swage ring and the sudden reduction of force at that critical point prevents full insertion of the J-lock pin and results in the false lock condition. (Poczynok June 28, 2019 Report at pp. 2-6.)

### III.    ARGUMENT

**A.    Defendant's Request That the Court Ignore Plaintiffs' Experts' Testimony for Summary Judgment Is Improper.**

While ignoring consistent evidence that Armstrong and the ladder fell backwards as supported by eyewitness testimony and the fact that the back of Armstrong's head hit the cement, Defendant argues that Plaintiffs have offered nothing more than "speculation" in support of its theory on causation, arguing that Plaintiffs' experts' opinions are "directly contradicted by indisputable physical evidence." Defendant's argument is incorrect and misplaced as there is competing and conflicting evidence in the record, not "indisputable" as Defendant argues.   Plaintiffs have offered expert opinions outlining how a false lock on Defendant's ladder caused Plaintiff's injury based on all available evidence in the record.  Experts are free to review all evidence and make determinations regarding weight and credibility in order to reach their conclusions.  As the Fifth Circuit recently explained, "expert testimony is not subject to exclusion just because it contradicts other evidence in the record—to the contrary, at summary judgment that is the main point of expert evidence." *Certain Underwriters at Lloyd's, London v. Axon Pressure Products Inc.*, 951 F.3d 248, 271 (5th Cir. 2020).

Defendant's very argument was made to the Fifth Circuit some years earlier in *Pipitone* to no avail.  There, the defendant was sued because the product it manufactured caused the plaintiff to develop a salmonella infection after his physician injected his knee with the product.  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 241 (5th Cir. 2002).  Without studying the actual product itself, the plaintiff's expert found that based on his "knowledge

of and experience with salmonella and how people do and do not contract it, as well as his observation of [the plaintiff], the [defendant's product] was the source of the contamination." *Pipitone*, 288 F.3d at 246.  After the district court excluded the expert's opinion and granted summary judgment in the defendant's favor, the plaintiff appealed. On appeal, the defendant argued that even if the court did not exclude plaintiff's expert's opinion, the plaintiff produced no evidence showing there were issues with the manufacturing process, particularly given certain testimony that salmonella "simply could not survive" the defendant's manufacturing process.  *Pipitone*, 288 F.3d at 250.  The Fifth Circuit disagreed.  It declined to exclude the testimony of plaintiff's expert and found that it created a genuine issue of material fact as to whether there were problems in manufacturing the product at issue.  *Pipitone*, 288 F.3d at 250.

Defendant's argument shows that there is a genuine issue of material fact here as evidenced by its disagreement with the opinions of Plaintiffs' experts and the facts they have relied upon.  *Cf. Certain Underwriters at Lloyd's*, 951 F.3d at 271.  Rather than summary judgment, the proper remedy for Defendant's complaint is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[.]"  *Pipitone*, 288 F.3d at 250 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993)).  Indeed, when there are conflicts in the evidence and genuine issues of material fact, summary judgment is improper.  *Crochet v. Bristol-Myers Squibb Co.*, 804 Fed. Appx. 249, 256 (5th Cir. 2020) (declining to grant summary judgment where contradictory evidence existed in the record and noting that "[e]ven 'thin' contrary evidence can be sufficient to create a fact issue.") (internal citations omitted); *Luna v.*

*Macy's S., Inc.*, CV H-17-1759, 2018 WL 3609053, at *6 (S.D. Tex. July 27, 2018) (declining to grant summary judgment where there were "too many factual disputes."); *Pennington v. Baylous*, CIV.A. H-03-4163, 2005 WL 2241014, at *2 (S.D. Tex. Sept. 15, 2005) (finding that Plaintiff provided sufficient evidence to survive summary judgment based on the facts recounted in various sworn statements).

**B.   Plaintiffs' Theory of Causation is Supported by Expert Testimony Based on Factual Evidence**

Summary judgment may not be granted under FED. R. CIV. P. 56(a) where, as in this case, there are genuine issues of material fact that require resolution by the jury.  Here, there are literally genuine issues of material fact as to what *caused* Armstrong's fall as supported by competing expert opinions.  Both parties have retained engineering experts to provide opinion testimony based on factual evidence.  The experts have different causation opinions based on disputed facts.  This is a classic "battle of the experts" case that renders summary judgment presumptively inappropriate.  *See*, *Watson v. Allstate Texas Lloyd's*, 224 Fed. Appx. 335, 342 (5th Cir. 2007); *Edwards Sys. Tech., Inc. v. Digital Control Sys., Inc.*, 99 Fed. Appx. 911, 921 (Fed. Cir. 2004).\

Plaintiffs' experts base their conclusion that Armstrong's accident was caused by the false locking of the Ladder on actual evidence, not mere speculation as Defendant suggests.  As discussed at length in their Rule 26 Reports, the eyewitness testimony and physical evidence *supports* Plaintiffs' theory of causation and *refutes* the slide out theory proffered by Defendant's expert, Knox.  That evidence includes the descriptions under oath of Mr. and Mrs. Kronshage about what they saw as Armstrong and the Ladder fell

25

backwards and now, Mr. Kronshage's unsworn perception while attempting to provide assistance at the scene on the date of the incident as transcribed in the 911 call.

The evidence also includes the blood stain where the back of Armstrong's head hit the driveway and witness testimony establishing that Armstrong landed on his back, with his body perpendicular to the house, his head toward the street.  The jury can reasonably conclude the evidence supports the opinion of Plaintiffs' experts that Armstrong's fall was caused by a false lock that resulted in the telescoping of the upper extension of the Ladder.

Because Armstrong was in a coma and has no recollection of the accident, he cannot provide direct testimony about the cause of his fall.  However, his testimony about his custom and practice when using the Ladder, in conjunction with Mrs. Kronshage's testimony regarding Armstrong's fall, is inconsistent with Defendant's slide out theory.  For the sake of argument, there would have been substantial physical damage to the home had the Ladder slid out as they speculate, and Armstrong likely would have fallen on his face on top of the ladder which is inconsistent with the indisputable fact that his head hit the cement.  Armstrong's custom and practice testimony supports the opinion of Plaintiffs' experts that the cause was a sudden, unexpected telescoping of the Ladder caused by false locking of the J-locks—a condition Armstrong did not know had occurred when he climbed the Ladder.

A jury must decide which of the experts' theory of causation is most supported by the evidence.  Because a jury may reasonably conclude that the evidence supports Plaintiffs' causation theory, Defendant is not entitled to summary judgment on that issue.

26

**C.    The Evidence that Defendant has Since Changed the Design of its J-Locks Supports the Defective Design Opinion of Plaintiffs' Expert.**

Poczynok suggests design changes that are not complex and involve only minor engineering modifications.  Defendant has proven the alternative design changes are feasible.  For example, Poczynok proposed in his Report that Defendant could have reshaped the tip of the J-lock pin into a more tapered, conical or "bullet" shape.  (Poczynok Report at pp. 42, 48; Poczynok Depo. 159:20-161:9; 162:20-163:8; 164:21-165:2.) Subsequently, Defendant has essentially followed that advice by increasing the taper on the end of the J-lock pin.  The latest version of Defendant's comparable ladders includes a tapered tip on the J-lock pin that facilitates its insertion into the holes in the side of the ladder.  The new J-lock pins are also now smooth and free of cracks, as required by the critical specifications.  This evidence is admissible to show that the alternative designs proposed by Poczynok were technologically and economically feasible, when feasibility is contested.  *Dixon v. Int'l Harvester Co.* 754 F. 2d 573, 583-84 (5th Cir. 1985).

Because Defendant's motion for summary judgment claims Plaintiffs must prove the feasibility of Poczynok's alternative designs, feasibility is still apparently contested by Defendant.  The evidence of Defendant's subsequent adoption of Poczynok's proposed alternative design is therefore admissible for the jury to consider when determining feasibility.  Based on this evidence, the jury may reasonably conclude that the changes made by Defendants made their ladders safer by eliminating or reducing the chance of false locking.

**D.    Plaintiffs' Experts Have Tied the Manufacturing Defects in the J-lock with the False Locking that Caused Armstrong's Accident.**

Defendant's causation argument is based on its claim that Plaintiffs cannot establish that the J-lock springs on the Ladder did not have "sufficient" force to operate as intended. As argued above, the question is not whether the springs in the J-locks had a constant level of force "sufficient" to fully insert the J-lock pins—whether three or four pounds—as intended. Plaintiffs' causation argument is based on the unexpected 25% *reduction* in the available spring force that caused the false locked condition. Plaintiffs' experts have established that the unexpected 25% loss in spring force occurs about one-half inch into the extension of the J-lock, which is the point the spring is attempting to insert the tip of the J-lock through the hole in the extension rail. The tip of the J-lock pin is in contact with the inner surface of the swage ring and the sudden reduction of force at that critical point prevents full insertion of the J-lock pin and results in the false lock condition. (Poczynok June 28, 2019 Report at pp. 2-6.)

The evidence also ties the reduction in spring force to the manufacturing defect in Defendant's J-locks. Specifically, the shafts of the pins on Defendant's J-locks do not meet critical tolerances specified by Defendant's own drawings—that the pin have a specified diameter and a smooth surface.

Harold Arthur Wing, the CEO and majority shareholder of Defendant Wing, testified at his deposition that the intent of the J-lock design is to have the spring on the lock perform consistently each and every time. (Deposition of Harold Arthur Wing ("Wing Depo.") 64:23-65:8 [Exhibit 11].) Mr. Wing testified that one of the factors that may affect

28

a spring constant is the surface the spring is riding on; and a rougher surface may affect the spring constant.  (Wing Depo. 66:18-24.)  He acknowledged that the intent of Wing's design is to have the spring constant as consistent as possible.  (Wing Depo. 89:25-90:7.) Mr. Wing testified that Drawing No. 50952 specifies that the radial surface of the J-lock pin over which the spring fits should be "smooth and free of cracks." (Wing Depo. 81:24- 83:4.)  Mr. Wing testified that all the dimensions called out on the J-lock drawings are "critical" and must meet the specifications within the amounts of tolerance specified. (Wing Depo. 88:18-89:3.)

Plaintiffs' experts have also established that the diameter of the J-lock pin shafts fell below the critical dimension of 0.375" required by Wing Drawing 50952.  Plaintiffs' spring expert concludes that the out of tolerance J-lock pin shafts cause the spring to "snake" and cause a reduction in spring force.  (Hayes Report at pp. 4, 11; Poczynok February 28, 2019 Report at pp. 47-49.)  This manufacturing defect is another cause of the sudden 25% reduction of spring force that prevents the J-lock pin from properly locking the Ladder extension.

The causation opinions of Plaintiffs' experts are based on actual evidence that shows a reduction in spring force caused by manufacturing defects in Defendant's J-locks. Plaintiffs' experts tie that reduction in spring force to the false locking of the J-locks on the Ladder that they have demonstrated can occur.  There are clearly factual issues regarding the cause of Armstrong's accident that must be presented to a jury.  Defendant's motion for summary judgment on the issue of causation must be denied.

## IV.    CONCLUSION

Summary judgment under is not appropriate in this case because there are clearly genuine issues of material fact for the jury to determine.  Defendant's renewed motion and Plaintiffs' opposition underscores that the experts for both parties place different weight on the evidence to support their different opinions on the cause of Armstrong's accident. Defendant seizes on Plaintiffs' experts' supplemental reports based on additional evidence of a disputed fact as "new found convictions" rather than what they are: carefully reasoned, reliable, methodical opinions based on the totality of available evidence.  This is a case in which the competing expert opinions and the underlying facts preclude summary judgment and require a jury trial.  Defendant's motion for summary judgment must be denied.

Dated: January 8, 2021

Respectfully Submitted,

**LAW OFFICES OF FRIEDBERG & BUNGE**

*/s/ THOMAS F. FRIEDBERG, ESQ.*
THOMAS F. FRIEDBERG, ESQ.
Federal ID 3193945
755 West A Street, Suite 100
P.O. Box 6814
San Diego, California 92102
619.557.0101 (Tel.)
619.557.0560 (Fax)
tom@lawofficefb.com


**THE AMARO LAW FIRM**

*/s/ R. JAMES AMARO, ESQ.*
R. James Amaro
SBN: 24036134
Federal ID 36070
Anna J. McMullen
SBN: 24109535
Federal ID 3402763
2500 E. TC Jester Blvd., Ste. 525
Houston, Texas 77008
713.864.1941 (Tel.)
713.864.1941 (Fax)
fax@amarolawfirm.com

**ATTORNEYS FOR PLAINTIFFS MARK AND ERIKA ARMSTRONG**

31

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT** was served on the 8th of January, 2021 by causing this document to be filed on the CM/ECF system which will provide notice to the following parties and counsel:

Matthew S. Parish, Esq.
SBN: 24014279
Federal Identification No.: 25140
**TAUNTON, SNYDER & PARISH, P.C.**
580 Westlake Park Boulevard, Suite 1120
Houston, Texas 77079
TEL: (713) 961-5800
FAX: (713)993-2308
Email: mparish@tsslawfirm.com

R. James Amaro
SBN: 24036134
Federal ID 36070
Anna J. McMullen
SBN: 24109535
Federal ID 3402763
**AMARO LAW FIRM**
2500 E. TC Jester Blvd., Ste. 525
Houston, Texas 77008
713.864.1941 (Tel.)
713.864.1942 (Fax)
Email: fax@amarolawfirm.com

*s/THOMAS F. FRIEDBERG, ESQ.*